IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

**Civil Action No. 10-cv-02945-WYD-KLM**

RANDALL C. MUSTAIN-WOOD;

Plaintiff:

v.

NORTHWESTERN MUTUAL LIFE INSURANCE COMPANY,

Defendant.
_____

## PLAINTIFF'S OPENING BRIEF
_____

      COMES NOW Plaintiff, Randall C. Mustain-Wood ("Plaintiff" or "Mustain-Wood"), by and through his attorneys, Cameron W. Tyler and Associates, P.C., and submits the following Opening Brief.

      This case involves denial of long-term disability ("LTD") benefits to Plaintiff. Plaintiff is a beneficiary of a Northwestern Mutual Life Insurance Company ("Defendant") LTD insurance plan ("the Plan"), a welfare benefit plan subject to § 502(a)(1)(B) of the Employee Retirement Income Security Act of 1974, as amended ("ERISA").

## PLAINTIFF'S STATEMENT OF MATERIAL FACTS

     1.    Randall Mustain-Wood is a 63 year-old divorce law attorney/litigator. He has

been practicing since 1979 and has only practiced in the area of family/divorce law (290).[1]

2.      On October 7, 2009, Plaintiff was experiencing congestive heart failure with marked pulmonary hypertension due to chronic valvular heart disease and aortic stenosis (96-97). At the time of his admission on October 8, 2009, Plaintiff had a severely depressed left ventricular systolic function with an estimated ejection fraction of 10% to 15%, and was in overt heart failure (44). Martha A. Cabeen, M.D. concluded Plaintiff at some point in the past had suffered a myocardial infarction which led to his congestive heart failure (107).

3.      On October 13, 2009, Thomas L. Matthew, M.D. performed an aortic valve replacement surgery and thoracic aortic aneurysm repair on Plaintiff (43).

4.      Post-operatively, Plaintiff continued to experience significant respiratory distress due to fluid overload (88).

5.      Post-surgery, Dr. McNeil, the cardiologist assigned to Plaintiff in the emergency department, noted during various office visits that the systolic and diastolic function of Plaintiff's left ventricular was abnormal, as demonstrated on both the Echocardiographic Report done November 16, and the EKG done on November 13, 2009 (46, 49, and 55). Plaintiff also had non-specific mitral leaflet thickening, mild mitral valve regurgitation, and trace tricuspid regurgitation (122).

6.      On November 13, 2009, Dr. McNeil prescribed cardiac rehabilitation for Plaintiff (67).

---

[1]   The Administrative Record is referred to by the bates-stamp numbers used by Defendant, using only the necessary last portion of that number.

7.     On December 30, 2009, Dr. McNeil completed a Group Disability Claim Attending Physician Statement report on Plaintiff which stated that Mustain-Wood had no physical limitations or restrictions.  The report does not address Plaintiff's cardiac rehabilitation, his significant fatigue later documented by Dr. Doucet, his endurance, or ability to sustain mental activity, particularly under stress, other than stating: "[Mustain-Wood] feels he is unable to return to work and function in the same previous capacity due to the intense emotional stress he experiences practicing as an attorney."  The report notes Plaintiff has "mild" adaptation to stress – meaning he "can perform most functions" (132-33).

8.     Plaintiff's cardiac rehabilitation started on January 20, 2010, and involved 36 sessions (175).  He had difficulty doing the treadmill at any but the lowest settings initially, and steadily improved, but still needed rest after cardiac rehab sessions and physician-ordered exercise (244).

9.     On March 17, 2010, Dr. McNeil wrote a note to Defendant, stating:

> Randy Mustain-Wood is currently enrolled and taking part in a cardiac rehabilitation program.  Due to his commitment to his recovery he is unable to return to work during his treatment period.  Mr. Mustain-Wood is due to complete his program June 13, 2010 (118 and 175).

10.     As of July 21, 2010, a month after completing cardiac-rehabilitation, per Dr. Doucet, Plaintiff had impairment of his ejection fraction at 46% with associated diastolic dysfunction and left ventricular hypertrophy.  He "also has an abnormal EKG and certainly has relatively poor exercise tolerance for a man his age," including transient edema of the lower extremities, chest tightness and pressure which occur both at rest and with psychological and emotional stress.  Specifically:

he has tried to return to work in a relatively low stress position as a mediator at his practice on Tuesdays and Fridays, but even with those interactions, he has experienced undue chest discomfort, tightness and some anxiety (43).

11.     Dr. Doucet noted that working "8 hours two times a week" caused Plaintiff

"significant fatigue" (44). Dr. Doucet notes that Plaintiff "still suffers from elevation in

pulmonary pressure on the basis of chronic valvular heart disease which is likely one of the

causes of his compromise in exercise and physical capacity." Testing documented that the

systolic and diastolic function of his left ventrical was abnormal (45). Dr. Doucet noted: "I

certainly do not think that he should return to work as a divorce trial attorney because of the

additional stress it would place on his heart" (45).

12.     Mustain-Wood is a beneficiary of the LTD Plan issued by Defendant, which is

subject to ERISA.

13.     The Plan was originally issued to Plaintiff's law firm in 1995, and is subject to

renewals every 36 months, subject to amendments and rate increases (12 and 352).

14.     Plaintiff's firm renewed the Plan on March 1, 2009 (Stipulation attached as Exhibit

"A").

15.     The Plan contains an "Own Occupation" definition of disability or partial

disability. The policy states:

> You are Disabled from your Own Occupation if, as a result of Sickness . . . you
> are unable to perform with reasonable continuity the Material Duties of your Own
> Occupation. You may meet the Own Occupation Definition of Disability while
> working in another occupation (347).

16.     The Plan defines "Own Occupation" as:

. . . any employment, business, trade, profession calling or vocation that involves Material Duties of the same general character as your regular and ordinary employment with your Employer.  Your Own Occupation is not limited to your specific job with your Employer or to your specific area of specialization, interest or expertise within the general occupation (347).

17.     The Plan defines "Material Duties" as:

. . . the essential tasks, functions and operation, and the skills, abilities, knowledge, training and experience, generally required by employers from those engaged in a particular occupation (347).

18.     The Plan defines "Partial Disability" as:

During the period preceding your Beginning Date and during the Own Occupation Period, you are Partially Disabled if you are working in your Own Occupation but, as a result of Sickness, Injury, or Pregnancy, you are unable to earn more than the Own Occupation Income Level (347).

19.     The Plan contains a "Mental Disorder" limitation which states:

Benefits will not be provided for more than 24 monthly benefit periods in total for your lifetime for all Disabilities or losses primarily due to any Mental Disorder . . . (347).

20.     The Plan defines "Mental Disorder" as:

. . . any disease, condition or disorder, whether organic or inorganic, customarily within the scope of treatment of psychiatrists, psychologists, psychotherapists or counselors.  This includes, but is not limited to:

- •      psychosis, psychoneurosis, anxiety and depression; and

- •      behavioral, adjustment, emotional, personality, and stress-related disorders (347).

21.     Plaintiff's Own Occupation Income Level, per the Plan, is "80% of your indexed

Predisability Earnings" (360).  "Predisability Earnings" are "based on your last full day of Active

Work" (359).

22.     Plaintiff's earnings as reflected on his K-1s for the law firm for the first ten months of 2009 were $255,943 (327).  His earnings for full-year 2008 were $366,924 (325).  Plaintiff's monthly Predisability Earnings, therefore, using a 22 month average up to his last day of Active Work, were approximately $28,312.

23.     The Plan provides for a 90 day waiting/elimination period, and that benefits are 60% of Predisability Earnings, not to exceed $10,000 per month (358).  The maximum benefit period, given Plaintiff's age on October 6, 2009, is to age 65.  His date of birth is January 23, 1948, meaning he is eligible for 36 months of benefits at $10,000 per month (1/9/10 through 1/23/13) (243).

24.     Plaintiff had no income between the date of his disability and June 21, 2010, when he completed his cardiac rehabilitation.  At the end of June, 2010, Mustain-Wood began making $1,200 per month doing part-time mediation work at his former law firm, not actually representing any clients (243).

25.     The Plan provides for a formula for payment of a Proportionate Benefit for Partial Disability (366).  Using the Plan formula, because Plaintiff had no income until July 1, 2010, his Proportionate Benefit would be the full amount of his LTD benefit – $10,000 per month.  From July 1, 2010 forward, based on Plaintiff's earnings of $1,200 doing part-time consulting, Plaintiff's Proportionate Benefit is $9,576 per month.

26.     Defendant initially denied LTD benefits to Plaintiff based solely on Dr. McNeil's December 30, 2009 Group Disability Claim Attending Physician Statement report (163).

27.     Plaintiff appealed Defendant's denial on July 27, 2010 (250).

28.     Plaintiff's appeal included three reports from experts concerning his inability to return to his own occupation.  The first was from Dr. Jamie Doucet, his treating cardiologist.  Dr. Doucet identified a number of cardiac abnormalities and concluded that Mr. Mustain-Wood was physically disabled from his own occupation (45).

29.     The second report was from David Robinson, Ph.D., documenting substantial peer-reviewed research about the physiological effects of stress on cardiac pathology, specifically with regard to Mr. Mustain-Wood's own occupation.  Dr. Robinson met with Plaintiff and Sally Schneider, J.D. for hours to identify the actual stressors and degree of stress involved in Plaintiff's own occupation.  Dr. Robinson specifically stated that Plaintiff was physically disabled from returning to the material and substantial duties of his own occupation due to stress (75-86).

30.     The third report was from Sally Schneider, J.D., a divorce attorney whose practice is very similar to Mr. Mustain-Wood's, describing in detail the physical demands and effects of stress performing the material duties of Mr. Mustain-Wood's own occupation (289-297).

31.     Defendant had an osteopathic doctor, Cheryn Grant, D.O. review Plaintiff's claim "from a psychiatric point of view" (21).

32.     Defendant had an internal medicine/interventional cardiologist, Henry Garrison, M.D., review Plaintiff's claim from a cardiology point of view (30).

33.     Both Dr. Grant and Dr. Garrison were asked by Defendant: "Was Mr. Mustain-Wood precluded from performing full-time work because of his participating in cardiac

rehabilitation?" (32).

34.     Dr. Grant states: "We do note that Mr. Mustain-Wood took part in a cardiac

rehabilitation program.  We do not have any information from that program, which was

reportedly completed on 6/13/2010" (21).

35.     Dr. Garrison's response reflects that he too was given no information from

Defendant regarding the specifics of Plaintiff's cardiac rehabilitation or how it affected him.  He

notes that "Dr. MacNeil's [sic] notes mentioned that the claimant was not able to return to his

position as a trial attorney during the time he was taking part in cardiac rehabilitation" (30).   Dr.

Garrison then states:

> I do not feel qualified to make remarks about stress and its avoidance as a general
> issue.  Dr. MacNeil [sic] and Dr. Ducett, the two cardiologists involved, both
> mention the high stress nature of the claimant's work and mention is made that
> the claimant was experiencing some chest discomfort with emotional stress in the
> postoperative period.  I would conclude that perhaps is the reason the cardiologists
> judged that the claimant should not return to his previous employment (32).

36.     Dr. Garrison concludes that: "Dr. MacNeil [sic] mentions cardiac rehabilitation and

the time requirements for that having an impact on his ability to return to work prior to June 13,

2010, but that strictly speaking does not constitute cardiac-related limitations and restrictions"

(32).

37.     Defendant did not provide Dr. Garrison or Dr. Grant with Sally Schneider, J.D.'s

report concerning the material and substantial duties of Plaintiff's own occupation, particularly

with regard to stress.(28 and 36).  The description of "specific physical and mental demands

required of the occupation" given by Defendant to Garrison and Grant was as follows: "The

occupation of Attorney requires superior cognitive function to prepare legal documents, interpret

laws, rulings and regulations, and advise clients regarding legal rights." (28 and 36).

38. Dr. Grant specifically informed Defendant that the lack of information from Ms.

Schneider was a critical omission, stating:

> "We have absolutely no information on Mr. Mustain-Wood. . . . There is no
> information that discusses any of the interview with Mr. Mustain-Wood or
> specifically with Ms. Schneider. . . . The only information we have regarding how
> Mr. Mustain-Wood is functioning in his day-to-day life is the [December 30,
> 2009] APS from Dr. McNeil" (22).

39. Dr. Grant concluded her report by noting that Plaintiff probably had anxiety, stating:

"Certainly, having a significant heart problem is anxiety-provoking, and when that occurs,

individuals often will not do what they were previously doing because of the fear that these

activities will only cause more problems" (22).

40. Dr. Grant notes that Dr. Doucet documented Plaintiff had physical symptoms,

"chest tightness and some anxiety when he attempts to return to work," (22) and also

acknowledges that stress is a factor in causing cardiac disease (24). Dr. Grant states that Plaintiff

could change his work (i.e., his job duties) to reduce the stress (23 and 24).

41. Dr. Grant states that Dr. Robinson's report does not address how stress affects

Plaintiff (because she did not have Sally Schneider, J.D.'s report) (25).

42. Defendant had Francine Dittrich, M.S., a "vocational case manager" provide

"documentation of the physical and mental demands required to perform the Material Duties of

an Attorney" (273).

43. Defendant did not provide Dittrich with David Robinson, Ph.D.'s report, Sally

Schneider, J.D.'s report, or Plaintiff's statements about the specific material and substantial

duties of Plaintiff's own occupation (273).

44.    Defendant did not provide Dittrich any information about the material and
substantial duties of Plaintiff's own occupation, or that Plaintiff was seeking LTD benefits
because he was unable to withstand the stress requirements of his own occupation following his
heart attack (273).

45.    Dittrich's report and documentation supplied to Defendant, as a result, focused
almost entirely on the physical demands of what is typically a "sedentary" occupation (273). The
only "mental requirements" identified which have any bearing on this case, in six pages of
documentation, occur in one paragraph on "Temperaments." (276 and 279). Performing
effectively under stress is mentioned just once (276). Having to use superior learning and
judgment is identified.

46.    Dittrich's opinion in her report is that "Based on my review of Mr. Randall-
Mustain-Wood's claim file, specifically the employer provided job description document titled
Employer Statement Attachment, it is my opinion that this report best represents his own
occupation as it is currently performed" (279). In other words, Dittrich concluded the general job
duties of an Attorney described in the DOT match the material and substantial duties of
Plaintiff's own occupation.

47.    The Employer Statement Attachment which Dittrich relied on was provided by
Defendant to Dittrich and does not describe Plaintiff's material and substantial duties in any
detail, specifically omitting all reference to stress (298). This Employer Statement Attachment
says:

Randall C. Mustain-Wood is a Partner/Attorney at Mustain-Wood, Walker & Schumacher which specializes in family law.  Mr. Mustain-Wood, meets with clients, appears in Court, negotiates cases with Opposing Counsel, interviews witnesses, prepares cases for trial, contacts experts and works with office staff on administration of the law office (298).

48.    Mustain-Wood had provided Defendant with an actual statement of the material and substantial duties of his own occupation, which Defendant did not provide to Dittrich or Drs. Harrison and Grant (244-45 and Sally Schneider, J.D.'s report).

49.    Mustain-Wood's information about the material and substantial duties of his own occupation demonstrated that making acute judgment decisions while under severe emotional distress is a critical component of his work.  Mustain-Wood had informed Defendant that during the last three years of his trial practice, from 2007 to his heart attack in October, 2009, averaged 25-30 high-value, high-conflict, cases per year.   The high degree of stress in his occupation was due to the stakes involved as well as the intense relationship conflicts in his cases.  Plaintiff routinely dealt with parents and children with special needs and mental health disorders, such as ADD, bipolarity, severe depression, MS, alcohol and/or drug addiction, Asberger's, severe hearing and/or visual impairment and education and learning disorders as well as with domestic violence.  Approximately 85% of Mustain-Wood's cases involved litigation, and he appeared in courts across the State of Colorado.  Plaintiff regularly worked more than 75 hours per week, with a minimum of 68 to 70 hours a week.  (3).  His share of the monthly overhead at the firm at which he was a partner averaged $10,000 to $12,000 per month (244-245, and Schneider report 294-297).

50.    Mustain-Wood's statement specifically informed Defendant that even occasional

contact with his office regarding case issues caused him to suffer:

> . . . anticipatory stress, physical pain in my chest before, during, and after the telephone conferences, and the disruption of sleep both before and after the case conferences. . . . I lack the mental acuity that was required of me in the past to perform my job as a litigator, i.e. to bring together all of the complexities that are required in the courtroom to perform my best work for the good of the client (245).

51.     On October 21, 2010, Defendant issued a letter upholding its denial of Plaintiff's claim for long term disability benefits under the Plan (the "Appeal Letter") (167).

52.     The Appeal Letter addresses, in several places, Plaintiff's claim for benefits while he was undergoing cardiac rehabilitation and not working.

> The only other report you presented from Boulder Community Hospital is a "Discharge Summary Report" check sheet, which apparently is regarding Mr. Mustain-Wood's cardiac rehabilitation program that he enrolled in after he underwent cardiac surgery on October 14, 2009. According to this document, Mr. Mustain-Wood attended 36 rehabilitation sessions between January 20, 2010 and June 21, 2010, which extended over a period of 21 and one-half weeks. This document also indicates that Mr. Mustain-Wood was in a "Low" "Risk Class." We did not find any information on this form indicating that Mr. Mustain-Wood was unable to work while attending cardiac rehabilitation (175).

> On March 17, 2010, Dr. McNeil wrote: Randy Mustain-Wood is currently enrolled and taking part in a cardiac rehabilitation program. Due to his commitment to his recovery he is unable to return to work during his treatment period. Mr. Mustain-Wood is due to complete his program June 13, 2010 (175).

> According to Defendant: "This statement from Dr. McNeil on March 17, 2010 contradicts his expressed opinion that Mr. Mustain-Wood was not physically impaired from returning to work as documented on the Attending Physician's Statement (APS) completed approximately three and one-half months prior (December 20, 2009). On the APS Dr. McNeil noted that he had last seen Mr. Mustain-Wood on November 18, 2009, which is also the last time he had seen him based on the records from your office received September 7, 2010. Because of the contradicting statements received from Dr. McNeil, our letter to you dated August 23, 2010 asked you to provide "a complete copy of all of Dr. McNeil's medical records regarding [Dr. McNeil's] treatment of [Mr. Mustain-Wood] since