IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

**Civil Action No.  10-cv-02945-WYD-KLM**

RANDALL C. MUSTAIN-WOOD;

Plaintiff:

v.

NORTHWESTERN MUTUAL LIFE INSURANCE COMPANY,

Defendant.

_____

**PLAINTIFF'S RESPONSE BRIEF**
_____

COMES NOW Plaintiff, Randall C. Mustain-Wood ("Plaintiff" or "Mustain-Wood"), by

and through his attorneys, Cameron W. Tyler and Associates, P.C., and submits the following

Response Brief.

## I.    PLAINTIFF'S RENEWAL POLICY IS SUBJECT TO THE LAWS IN FORCE AT THE TIME THE RENEWAL OCCURRED.

Defendant contests the applicability of § 10-3-1116 to this case.  Defendant argues that

the statute applies to "insurance plans issued in this state" and that the legislature intended that

phrase to not mean insurance plans <u>renewed</u> in this state.

The Tenth Circuit has long recognized the blackletter rule set forth in *Couch on*

*Insurance* (3d) 29:43 **Effect of Intervening Statutes**, which states as follows:

> One exception to the principle that the renewal contract is the same as the original
> contract involves statutes enacted prior to the renewal; these ordinarily become a
> part of the renewal contract since, generally, a renewal contract is subject to the
> laws in force at the time it is affected.

*See Moses v. American Home Assur. Co.*, 376 So.2d 656, 658 (Ala. 1979)(holding each time the group disability insurance policy was renewed a new effective date for the policy was created "making it subject to any law in effect at the new effective date"); *State Farm Mut. Auto. Ins. Co. v. Pierce*, 157 N.W.2d 399, 399 (Neb. 1968) ("a renewal contract is subject to the laws in force at the time the contract became effective"); *Granite States Ins. Co., supra* at 1064 (holding "[e]ach time [an insurance] policy [is] renewed, a new effective date for the policy [is] created, thus, making it subject to any law in effect at the new effective date").

*Government Emp. Ins. Co. v. United States*, 400 F.2d 172 (10th Cir. 1968) involved a renewal policy "charging the same annual premium, bearing an identical number, and containing the same general provisions as the previous policies" with an endorsement excluding the United States as an insured which the policyholder was not informed of. *Id.* at 173. The holding of the case was that "an insurance company is bound by the greater coverage in an earlier policy where the renewal contract is issued without calling to the insured's attention a reduction in policy coverage." *Id.* at 175. The Court also noted, however, that: "the renewal of an insurance policy constitutes a separate contract to be governed by general contract principles." *Id.* at 174-175.

More recently, in *Dalpaos-Lawrence v. Guidone America Insurance Company*, No. 06-7073 (10th Cir. June 15, 2007), the Tenth Circuit Court of Appeals stated, based on *Government Emp. Ins. Co., supra*, and Connecticut, Missouri, and Oklahoma case authority, that "it is black-letter law that the renewal of an insurance policy constitutes a separate contract to be governed by general contract principles." *Dalpaos-Lawrence, supra* (relevant portion attached). As a result, the Court looked to the status of the insured and the policy language in

- 2 -

effect following the renewal in determining whether coverage existed for a claim.

In ***Attorneys Liability Protection Soc. V. Reliance Ins. Co.***, 117 F.Supp. 1114, 1115

(D.Kan. 2000)(involving a group professional liability policy), the Court stated:

> The renewal of an insurance policy for a specified period (here, one year) is
> a separate and distinct contract. *See **Kane v. American Ins. Co.,*** 52
> Conn.App. 497, 725 A.2d 1000, 1002 (1999); ***Hercules Bumpers, Inc. v.
> First State Ins. Co.,*** 863 F.2d 839, 842 (11th Cir. 1989) ("It is a basic tenet
> of insurance law that each time an insurance contract is renewed, a separate
> and distinct policy comes into existence."); ***Government Employees Ins.
> Co. v. United States,*** 400 F.2d 172, 174-75 (10th Cir. 1968)(renewal of
> insurance policy constitutes separate contract).

In this case, Defendant has stipulated that the plan in effect at the time of

enactment of § 10-3-1116 was a <u>renewal</u> policy.  As a result, Plaintiff submits § 10-3-

1116 clearly applies to his claim and this case.  The policy was renewed after the statute

was in effect and before Plaintiff's claim accrued.

Plaintiff submits that the language "issued in this state" in § 10-3-1116 is not directed at a

difference between issued and renewed.  This language apparently intends to make a distinction

between plans issued elsewhere and delivered in Colorado versus plans issued here.  *See **Granite

States Ins. Co. v. Styles***, 541 So.2d 1062, 1064 Ala. 1989) (copy attached) (finding a new

amendment to a statute applied to a renewal policy "issued or delivered" in Alabama).

Defendant argues that when the General Assembly "includes a provision in one section of

a statute, but excludes the same provision from another section, we presume the General

Assembly did so purposefully."  Defendant's Opening Brief, page 13, citing ***Well Augmentation

Subdistrict of Central Water Conservancy District v. Aurora***, 221 P.3d 399, 419 (Colo. 2009)

- 3 -

(en banc).  However, that is not what happened here – there is no other section in § 10-3-1116 referring to renewal.  The rule of construction cited by Defendant does not apply.

In reviewing the statutes cited by Defendant, it is apparent that the General Assembly often uses the phrases "issued" and "issued or renewed" interchangeably.  *See, e.g.*, § 10-16-107, cited by Defendant, involving managed care plans.  There does not appear to be any express intent by the legislature, in § 10-3-1116, to vary from the black-letter rule that renewal policies are subject to the laws in force at the time of renewal.

## II.    PLAINTIFF IS ENTITLED TO PARTIAL DISABILITY BENEFITS.

Defendant's brief makes no mention of partial disability benefits to which Plaintiff is entitled under the Plan.

The Administrative Record demonstrates that Defendant failed to consider, evaluate, or offer partial disability benefits to Plaintiff.  Defendant does not dispute that Plaintiff earned no income from his October 7, 2009 disability date through completion of his cardiac rehabilitation in June, 2010.  Defendant does not dispute that Plaintiff has since been earning $1,200 per month doing part-time mediation work and no litigation.  Defendant does not dispute that Plaintiff's predisability monthly earnings averaged $28,312.

The Plan defines "Partial Disability" as:

> During the period preceding your Beginning Date and during the Own Occupation Period, you are Partially Disabled if you are working in your Own Occupation but, as a result of Sickness, Injury, or Pregnancy, you are unable to earn more than the Own Occupation Income Level (347).

Based on the Plan, Plaintiff's Own Occupation Income Level is 80% of $28,312, or $22,649.  Plaintiff clearly has not earned more than this amount.

- 4 -

Plaintiff submitted substantial evidence of medical conditions which qualify as Sickness under the Plan. Defendant simply chooses to ignore this evidence, claiming that after his open-heart surgery Plaintiff "recovered without any complications." Defendant's Opening Brief, page 1.

Plaintiff provided evidence from his treating cardiologist, Dr. Doucet, that he experienced painful and anxiety-provoking physical symptoms when encountering stress at work, that caused him to reduce his schedule and remove himself from litigation. Even two days at work as a mediator produced significant fatigue because of Plaintiff's decreased exercise tolerance from his high blood pressure and cardiac pathology. Plaintiff provided Defendant with solid statistical research on the dangers, risks, and known effects of stress on cardiac pathology (as Defendant's own experts acknowledge). Plaintiff provided Defendant with detailed documentation concerning his Own Occupation, which Defendant failed to even provide to its consulting experts (as documented in Plaintiff's Opening Brief).

Despite this, Defendant characterizes Plaintiff's not doing litigation as a "lifestyle choice", citing an outlier opinion that President Eisenhower and Vice President Cheney continued to work with heart conditions at stressful jobs. As is commonly known, President Eisenhower went on to suffer a stroke in office two years after his 1955 heart attack, signing an Executive Order allowing Vice-President Nixon to assume leadership should he become further incapacitated. Similarly, Vice-President Cheney continued to experience increasing cardiac problems after his coronary bypass surgery, requiring a special pacemaker, a left-ventricular assist device, and is now a candidate for a heart transplant. *See* www.Wikipedia.org.

Plaintiff is not required to continue working out of a sense of patriotic duty or heroism.

Plaintiff's cardiac condition is doing as well as it is in part because he is not doing stressful

litigation.  Plaintiff should not be required to play Russian Roulette to prove, empirically, that

stress causes further damage to his cardiac condition.  These propositions find support in many

reported decisions.

For example, in *House v. American Life Ins. Co.*, 499 F.3d 443, 453-455 (5th Cir. 2007),

the Fifth Circuit Court of Appeals found as follows:

> Even crediting the opinion of House's doctor that House's heart condition
> precludes him from resuming his stressful trial practice, House is clearly able to
> perform some of the material aspects of his occupation as an attorney, as
> evidenced by his post-surgery activities with his firm and his current legal
> employment with the Louisiana agency.  Under the policy, this . . . places him
> squarely within the definition of partial disability.

The *House* court noted that "House might have switched to a more sedentary non-trial legal

practice and still earned substantially more than he now does," but did not require that he do so.

*Id.* at 455.

See also *Stanford v. Continental Cas. Co.*, 514 F.3d 354, 358 (4th Cir. 2008)(in deciding

what constitutes a "disability" stating "[a] doctor with a heart condition who enters a high-stress

environment like an operating room" risks recurrence of a physical condition "in the sense that the

performance of his job duties may *cause* a heart attack").  Although the drug addict in *Stanford*

was held not to be disabled, the strongly-worded and well-reasoned dissent points out that

"whether the risk of future effects creates a present disability depends on the probability of the

future risk's occurrence").  *Id.* at 364.

*Lasser v. Reliance Standard Life Ins. Co.*, 344 F.3d 381 (3rd Cir. 2003) is right on point.

Dr. Lasser was an orthopedic surgeon who underwent coronary bypass surgery in 1996.  For ten

years he had no symptoms, but in 1996 he suffered a myocardial infarction.  He was prescribed

the same diet, exercise, aspirin regimen as Plaintiff Randall Mustain-Wood in this case.  As here,

Dr. Lasser's treating physician advised he reduce his stress level, including work-related stress

(evidence of a fact well-known to the medical world and documented by Plaintiff in this case --

that stress is a significant risk factor with coronary artery disease).  Dr. Lasser reduced his

workload, stopped taking night or weekend "call", and stopped performing emergency surgery.

Initially, the insurer approved Dr. Lasser's application for partial disability benefits.

A physician consulted by Reliance then issued a medical evaluation similar to the one in

this case by Dr. Grant (21-25), resulting in denial of Dr. Lasser's claim.  *Id.* at 384 and 389.  The

*Lasser* cardiological evidence is summarized as follows:

> He [the cardiologist chosen by Reliance] examined Dr. Lasser, subjected him to a
> treadmill test in November 1997, and concluded Dr. Lasser "does not demonstrate
> any cardiovascular disability."  During an earlier treadmill test by Dr. Steven Roth
> in April 1997, Dr. Lasser "achieved greater than 90% of age-predicted maximum
> heart rate" and experienced only "mild fatigue after 14 minutes."  A nuclear
> cardiologist, Dr. Christos Christou, noted that planar imaging of Dr. Lasser's heart
> conducted during the cardiovascular testing revealed only a "very small and
> probably clinically insignificant" heart defect.  *Id.* at 389.

Dr. Lasser's own treating physician gave him functional class limitations which the Court

of Appeals stated "do not suggest significant limitations on Dr. Lesser's ability to work as an

orthopedic surgeon."  *Id.* at 389.  Also, the Court found that the two physicians Reliance hired

supported the claim that stress avoidance was medically a good idea for Dr. Lasser.  The reports

of these physicians mirror the statements made in this case in the reports of Dr. Doucet

(cardiologist) and Dr. Robinson (psychologist), including statements like:

> "[A] reduced stress work environment and schedule is absolutely necessary to maintain this patient's health. . . .  stress regardless of exercise tolerance is a recognized independent risk factor for recurrent coronary artery disease . . . [and that] there are multiple studies . . . which demonstrate that stress causes flux in the level of catecholamines in the circulation which have been shown to be a precipitant of acute myocardial infarction and sudden death."

The major worry in Dr. Lasser's case is that "increased stress could bring about an even earlier failure of the graft."  *Id.* at 389.

Reliance excused one of the physicians it chose due to a conflict, and hired a third, who stated:

> "[t]here is little definitive evidence that emotional or job stress is causally related to the development or acceleration of coronary artery disease," and acknowledging "both physical and emotional stress are identified triggers of acute myocardial infarction [heart attack]," and concluding "Dr. Lasser could work a forty-hour week, but is not capable of resuming all of the customary duties and responsibilities of an orthopedic surgeon" and that he "should restrict his on-call or emergency surgery duties, given their stressful nature."  *Id.* at 390.

The Circuit Court found the evidence showed that Dr. Lasser's present physical condition was "excellent" but considering his job duties and his "anatomy", he was disabled, stating:

> Thus, all of the evaluating physicians – with the exception of Dr. Burke . . . agreed that Dr. Lasser's heart condition precludes him from safely performing on-call duties and emergency surgery.  Reliance's conclusion to the contrary thus **is arbitrary and capricious**.  To the extent that Reliance's determination . . . was that "it was unreasonable . . . to expect Reliance . . . to simply accept the opinion [that stress would exacerbate Dr. Lasser's condition] without any range of probability or actual proof that Dr. Lasser was at increased harm," we believe its determination was faulty.  *Id.* at 391.

The Third Circuit Court of Appeals found that Dr. Lasser's night and weekend "call" and emergency surgery were material duties of his occupation.  *Id.* at 387-388.  Dr. Lasser not doing night and weekend "call" or emergency surgeries is really no different from Plaintiff not doing

litigation.  Litigation was a material duty of his Own Occupation.  The inability to perform a

material duty of his own occupation shows that Plaintiff was at least partially disabled.

The Third Circuit concluded by announcing a "clarification regarding the burden of proof

in disability cases:"

> While the burden of proving disability ultimately lies with Dr. Lasser, to require
> him to provide statistics detailing the harm that working in his regular occupation
> might precipitate – raises the bar too high.  Most disability claimants will not have
> the means at their disposal (financial or otherwise) to obtain this kind of evidence.
> Therefore, once a claimant makes a *prima facie* showing of disability through
> physicians' reports . . . and if the insurer wishes to call into question the scientific
> basis of those reports . . . then the burden will lie with the insurer to support the
> basis of its objection.  It has not met that burden here.  *Id.* at 391.

Plaintiff submits that *Lasser* sets forth a good rule for this case, keeping in mind that

*Lasser* was decided on an arbitrary and capricious standard rather than a *de novo* standard.  Under

a *de novo* review, the Court is not required to defer to the insurer's rationale or to consider all

reasonable inferences drawn by the insurer.

Under either a *de novo* or arbitrary and capricious standard, Defendant's denial in this case

should be reversed.  Plaintiff has provided three professional reports demonstrating in as great

detail as these reports possibly could, the medical and scientific literature on the strong

relationship in patients with Plaintiff's condition between stress and increased coronary artery

disease, involving heart attacks and sudden death.  The treating cardiologist, Dr. Doucet strongly

recommended against Mr. Mustain-Wood returning to his stressful litigation practice.  The one

report Defendant literally seized upon was by a hospital-assigned cardiologist who never actually

saw Plaintiff, who subsequently endorsed disability at least until Plaintiff's cardiac rehabilitation

completed, and who never evaluated Plaintiff again.

### III.     PLAINTIFF PROVIDED EVIDENCE REGARDING THE SPECIFIC STRESSES INVOLVED IN HIS OWN OCCUPATION AND HIS DISABILITY.

Northwestern Mutual claims that Plaintiff failed to supply information about the stresses of his own occupation and how that stress affects him.  In particular, Defendant argues that (1) Plaintiff's evidence "pertains to research and large groups of people, but does not specifically refer to Mr. Mustain-Wood" and (2) Dr. Robinson did not discuss the information he received from Mr. Mustain-Wood, including any treatment or medication for stress.  Defendant's Opening Brief, pages 4-5.

In summary, Defendant rejects statistical evidence of the effect of stress on cardiovascular disease because it involves research and large groups of people.  This is as illogical as it sounds. The argument about Dr. Robinson is equally absurd – because Dr. Robinson did not write down all of the information he gathered in four hours of meeting with Mr. Mustain-Wood and Sally Schneider, J.D., the insurer simply says the report has no value in determining bearing whether Plaintiff is disabled or not (180).  An insurer "may not arbitrarily refuse to credit a claimant's reliable evidence, including the opinions of a treating physician." ***Black & Decker Disability Plan v. Nord***, 538 U.S. 822, 834 (2003).

It should be pointed out that Northwestern Mutual's consultants never met with Plaintiff at all, and were denied access to the details of how stressful Plaintiff's own occupation is, and how that stress affects Plaintiff, because Northwestern Mutual failed to give them that information. Sally Schneider, J.D.'s report (which Dr. Robinson had) sets forth in detail the information about

- 10 -

the stress in Plaintiff's work "based on phone calls and interviews with Mr. Mustain-Wood" (290-291).  The whole reason for Schneider's report was because she has the same kind of high-stress divorce litigation practice as Mustain-Wood.  Thus, Schneider's description in detail of the stresses involved in this work was clearly intended to document for the insurer the stresses experienced by Mustain-Wood (294-297).

Defendant also failed to accurately describe Plaintiff's current physical condition. Defendant claims Plaintiff had a complete recovery after surgery.  In fact, Plaintiff continues to have "compromise in exercise and physical capacity" probably resulting from "elevation in pulmonary pressure on the basis of chronic valvular heart disease" (61). Working just two days a week as a mediator result in "significant fatigue following even those minimal interactions" (61).

Dr. Doucet specifically noted the following evidence of Mr. Mustain-Wood's specific condition that led him to strongly state: "I certainly do not think that he should return to work as a divorce trial attorney because of the additional stress that it would place on his heart" (62):

> We know that Randy's heart is still structurally abnormal on the basis of left ventricular hypertrophy and concomitant mitral valve regurgitation in spite of his successful surgery.  He also has evidence of some impairment of left ventricular systolic function and abnormal EKG, specifically which shows in my office a sinus rhythm at a rate of 65, QRS duration of 134 which is prolonged with left axis deviation and very poor R-wave progression consistent with left anterior fascicular block which has progressed to an atypical left bundle-branch block (62).

Defendant's response, in its Appeal Letter, to the above information was to state: "we did not find any evidence of any significant abnormalities on examination documented in Dr. Doucet's report" (179).

- 11 -

Defendant says Plaintiff has no physical restrictions.  However, his most recent stress test dated August 6, 2010 notes: "BP was mildly elevated at rest, quickly increased with minimal exertion and then was slow to normalize in recovery. . .  (59)."  The ECG on August 6, 2010 was abnormal (58).  As a result, Plaintiff was told to "follow up with Dr. Doucet to discuss further medical management.  Routine moderate aerobic exercise with heart rate no higher than 130 bpm" (59).  Very little, non-litigation mediation work, causes Mr. Mustain-Wood to become very fatigued.

Defendant claims that Plaintiff only takes aspirin for his heart condition, whereas the chart states:

> His current medications include aspirin 250 mg daily, and then a complex
> naturopathic regimen including hawthorne berry, niacin, CoQ10, ginkgo biloga,
> fish oil, flax seed oil, vitamin D, multivitamin with vitamin K, ginsent,
> glucosamine, chondroitin, cayenne pepper b.i.d. and red yeast rice twice a day (60).

Contrary to what Defendant claims, Dr. Robinson did specifically correlate the risk factors for stress with Plaintiff's actual work and medical history, finding as follows:

> Anxiety, anger, high job demand, low control, absence of organizational support
> and perhaps other negative emotions characterize the job of divorce law/family law
> litigator.  These stresses are predictors of cardiovascular disease, which must be
> avoided by a 61-year old divorce law/family law litigator who has a personal and
> family history of cardiovascular disease (86).

In response to the above, in its Appeal Letter, Defendant stated: "Dr. Robinson's conclusory opinion is not based on the facts of Mr. Mustain-Wood's degree of physical or mental impairment as demonstrated by the available medical records specific to his conditions" (180).

Defendant finally argues that Plaintiff could do things to make his law practice less

stressful, including: "He could take less difficult cases . . . he could move closer to his office . . .

and he could work less than 68 to 70 hours per week."  Defendant's Opening Brief, pages 5-6.

Ironically, Plaintiff has done these and similar things to reduce the stress in his work.

Unfortunately, working less hours and doing less stressful work has reduced Plaintiff's income.

Doing what Defendant recommends is exactly why Plaintiff has a partial disability benefit claim.

In conclusion, Defendant's denial of any disability benefits in this case is illogical,

unreasonable, arbitrary and capricious.  The denial is contrary to the statements of Defendant's

own consultants about Plaintiff avoiding stress in his work and changing his job duties.  The

denial is contrary to the unanimous and informed opinions of the psychologist who spent four

hours interviewing Plaintiff and performing exhaustive research on the physical effects of stress

for individuals with similar heart conditions, and of Dr. Doucet, Plaintiff's treating cardiologist.

Respectfully submitted this ___14th___ day of November, 2011.

CAMERON W. TYLER and ASSOCIATES, P.C.

By:_ *s/ Cameron W. Tyler*_____
    Cameron W. Tyler
    3223 Arapahoe Avenue, Suite 300
    Boulder, Colorado 80303
    Tel:  (303) 443-2644
    law@camtylerlaw.com
    *Attorneys for Plaintiff*

**CERTIFICATE OF SERVICE**

I HEREBY certify that on this 14th day of November, 2011, a true and correct copy of the
foregoing **PLAINTIFF'S RESPONSE BRIEF** was electronically served on the following:

Andrew Altschul
Buchanan Angeli Altschul & Sullivan LLP

- 13 -

321 SW 4th Ave., Suite 600
Portland, Oregon 97204
Tel: (503) 974-5015
Fax: (971) 230-0337
andrew@baaslaw.com
*Attorneys for Defendant*


    *s/ Jan F. Guynn*
Jan F. Guynn, Paralegal